# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **GEORGE J. SAAD, et al.,** | ) | **CASE NO.  1:03CV2557** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **JUDGE ANN ALDRICH** |
| | ) | |
| | ) | |
| **GE HFS HOLDINGS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | <u>**MEMORANDUM OF OPINION**</u> |

On December 12, 2002, George J. Saad ("Saad"), Nour Management, Inc. ("Nour"), Deaconess Radiological Services, Inc. ("DRS"), and Deaconess Emergency Room Services, Inc. ("DERS") (collectively, the "Plaintiffs") filed a complaint in the Cuyahoga County Court of Common Pleas against GE HFS Holdings, Inc. ("GE") raising various fraud in the inducement, promissory estoppel, breach of implied duty of good faith, and breach of contract claims all arising out of an allegation that GE failed to extend credit and advance monies in connection with Deaconess Hospital, LLC ("Deaconess").  (Doc. No. 1-2.)

On December 17, 2003, GE filed a petition for removal on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332, 1441, 1446.  (Doc. No. 1-1.)

On December 1, 2005, GE filed a motion for summary judgment. (Doc. No. 48.) On December 29, 2005, Plaintiffs filed a brief in opposition. (Doc. No. 51.) On January 23, 2006, GE filed a reply. (Doc. No. 56.)[1]

All issues have been fully briefed and are ripe for adjudication. For the following reasons, GE's motion for summary judgment (Doc. No. 48) is **GRANTED**.

## I.    FACTUAL BACKGROUND

Plaintiff Saad is a resident of Brecksville, Ohio and a licensed physician specializing in vascular surgery. (Doc. No. 1-2 "Compl.," at ¶1.) Plaintiff Nour is an Ohio corporation engaged in the business of managing real estate holdings. Id. at ¶2. Plaintiff DRS is an Ohio corporation engaged in the business of providing radiological services. Id. at ¶3. Plaintiff DERS is an Ohio corporation engaged in the business of providing emergency room services. Id. at ¶4. All three corporations have their principle places of business in Cleveland, Ohio and at one time, performed services for the now-bankrupt, Deaconess. Id. at ¶¶2-4.

Defendant GE provides healthcare financial services and has its principle place of business in Bethesda, Maryland. Id. at ¶5. At all relevant times, it had contractual obligations to fund operations at Deaconess. Id. at ¶6.

In 1975, Saad became a member of the surgical staff at Deaconess, where he served for some time as chief of surgery. Id. at ¶8. In 2000, Deaconess' parent corporation, Primary

---

[1]     On June 30, 2006, the court granted GE's motion to file an amended complaint and counterclaim and ordered GE to file a superseding motion for summary judgment if necessary. (Doc. No. 58.) On July 10, 2006, GE filed a response indicating that a superseding motion for summary judgment was unnecessary. (Doc. No. 60.)

Health Systems, filed for bankruptcy.  Id. at ¶9.  Shortly thereafter, Saad put together a group of physicians and other individuals from the community to acquire the assets of Deaconess in order to keep it operating.  Id.  That effort failed and Saad formed his own company, Deaconess Hospital, LLC, and purchased all of the assets of Deaconess.  Id. at ¶10.  To fund this endeavor, Saad secured a loan from Bank One and obtained a $3,000,000.00 revolving line of credit from GE.  Id. at ¶11.

On October 20, 2000, Nour, Deaconess, and Pearlview Square, Inc. entered into a Loan and Security Agreement and Note with GE whereby GE agreed to extend credit to them pursuant to a certain revolving line of credit of even date up to $3,000,000.00, which was secured by Pearlview Square.  Id. at ¶12.  In May of 2002, the agreement was amended to increase the advance rate applied by GE from 80% to 85% and to include the delivery by Saad of a guaranty, which was capped at $750,000.00.  Id. at ¶14.  On June 06, 2003, the line of credit was increased to $4,500,000.00.  Id. at ¶15.

In October of 2000, Deaconess began experiencing operating losses.  Id. at ¶16.  Saad undertook various steps to control those losses, including causing DRS and DERS to pledge their accounts receivable to secure additional funding from GE.  Id. at ¶¶17-19.  These efforts proved insufficient and on November 21, 2003, Deaconess, along with Pearlview Square, Inc. and Indoga, Inc. (the "debtor plaintiffs") filed for bankruptcy.  Id. at ¶20.

After the bankruptcy petition was filed, the debtor plaintiffs filed a motion to continue the use of GE's cash collateral to fund hospital operations and pay employee wages.  Id. at ¶21. Expedited review was granted and on November 26, 2003, the bankruptcy court approved an emergency stipulation ("DIP Order") whereupon Deaconess would obtain an additional

-3-

$250,000.00 post-petition loan, conditioned upon Saad's agreement to increase his personal guaranty from the original cap of $750,000.00 to $1,000,000.00. Id at ¶22. According to Plaintiffs, GE was aware that absent the additional financing, Deaconess would have to cease operations whereas the hospital physicians threatened to stop working if they were not paid by 7:00 p.m. on Friday, November 28, 2003. Id. at ¶23.

However, according to Plaintiffs, GE only permitted Deaconess to use the proceeds from accounts receivable to secure a loan in the amount of $515,000.00, which covered the hospital's payroll, but failed to provide the additional $250,000.00 of post-petition financing. Id. at ¶26. According to Plaintiffs, because the bankruptcy court was closed for the Thanksgiving holiday, they could not invoke the assistance of that court in compelling GE to comply with the DIP Order. Id. at ¶27. Unable to purchase pharmaceuticals and medical supplies and because house physicians did not appear for the 7:00 p.m. shift, Saad declined to accept new patients and began transferring existing patients to neighboring hospitals. Id. at ¶31.[2] On November 29, 2003, Deaconess effectively ceased operations. Id. at ¶32.

On December 3, 2003, GE declared Deaconess in default of its obligations and delivered a demand letter to Saad to pay the full amount of his personal guaranty. Id. at ¶35.

On June 9, 2004, the debtor plaintiffs filed an adversary proceeding with the bankruptcy court raising various breach of duty, lender liability, and equitable subordination claims against GE. See In re: Deaconess Hosp., LLC, et al., Case No. 04-1319, Doc. No. 01 (Bnkr. N.D. Ohio Sept. 1, 2005). Although GE initially filed a motion for withdrawal of reference to consolidate

---

[2]     Having done so, Saad has since been criminally charged with violating City of Cleveland Ordinances 396 and 686, which require 30 and 60 days advanced notice to the City of Cleveland prior to the closure of any hospital. Compl., at ¶33.

-4-

the adversary proceeding with the instant case, on November 18, 2004, that motion was withdrawn and the two cases proceeded separately.  See Deaconess Hosp., LLC, et al. v. GE HFS Holdings, Inc., Case No. 04MC050 (N.D. Ohio Nov. 18, 2004).

On July 25, 2005, the bankruptcy case was settled.  On September 01, 2005, the adversary proceeding was settled, incorporating by reference the bankruptcy settlement decree. All claims were dismissed with prejudice.  See In re: Deaconess Hosp., Case No. 04-1319, Doc. No. 79.

In the instant case, Plaintiffs raise various fraud in the inducement, promissory estoppel, breach of implied duty of good faith, and breach of contract claims all arising out of the same allegations that were alleged in the adversary proceeding.  On July 7, 2006, GE filed a counterclaim requesting two judgments for relief under the DIP Order, a judgment for relief under Saad's personal guaranty, and a conversion claim.  (Doc. No. 59.)

GE seeks summary judgment, with respect to the complaint only, on two grounds.  First, it argues that the instant claims are owned by the bankruptcy estate, have since been released by the bankruptcy settlement, and are barred by the doctrine of res judicata.  In the alternative, it argues that the complaint otherwise lacks merit.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The party moving for summary judgment has the initial burden to either (1) present

affirmative evidence negating an element of the non-movant's claim or (2) demonstrate "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once that burden is met, the non-movant must set forth sufficient evidence to create a genuine issue of material fact. Klepper v. First Am. Bank, 916 F.2d 337, 342 (6th Cir. 1990). To avoid summary judgment, the non-movant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

All reasonable factual inferences must be drawn in favor of the non-movant. Humenny v. Genex Corp., 390 F.3d 901, 904 (6th Cir. 2004) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, "the mere existence of some alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Indeed, "[a] mere scintilla of evidence is insufficient; rather there must be evidence on which the jury could reasonably find for the non-movant." Humenny, 390 F.3d at 904 (internal quotation omitted).

### III. LEGAL ANALYSIS

#### A. Prudential Concerns

GE argues that this court is precluded from addressing the merits in this case because the instant claims (1) are owned by the bankruptcy estate, (2) have since been settled and released by the Trustee in the bankruptcy settlement, and (3) are otherwise barred by res judicata.

To determine whether the trustee is the appropriate individual to bring an action, courts tend to categorize three kinds of action:

(1) actions by the estate that belong to the estate;
(2) actions by individual creditors asserting a generalized injury to the debtor's

estate, which ultimately affects all creditors; and
(3) actions by individual creditors that affect only that creditor personally.

In re Schimmelpenninck, 183 F.3d 347, 359-60 (5th Cir. 1999).  The first two kinds of action are

owned by the bankruptcy estate and thus, only the trustee has the power to advance them.  The

third kind of claim, however, is not owned by the bankruptcy estate and may be advanced by any

party who claims a personal interest.  Id. at 360.  As one bankruptcy court aptly summarized:

> [A] bankruptcy trustee 'has the right to bring any action in which the debtor has an
> interest because this is property of the estate, the trustee is acting to benefit the
> debtor's estate, and is ultimately benefitting the estate's creditors upon distribution,'
> but trustees may not assert personal claims on behalf of certain creditors where the
> estate has no interest in the claims.

In re Agribiotech, Inc., 319 B.R. 216, 221 (Bankr. D. Nev. 2004) (quoting In re Agribiotech,

Inc., 319 B.R. 216, 386-87 (9th Cr. BAP 1997)); see also Francisco v. Bowman, 109 Fed. Appx.

24, 27 (6th Cir. Aug. 10, 2004) (recognizing that an individual creditor can only bring a claim

that rests on rights personal to him).  Thus, as long as the instant claims seek to redress

something beyond a mere general injury to the bankruptcy estate, this court has jurisdiction to

adjudicate them.

Though admittedly a close call, the court concludes that the instant claims are not owned

by the bankruptcy estate.  GE argues that because the instant claims arise out of the closure of

Deaconess, they are owned by the bankruptcy estate.  However, Plaintiffs are not alleging

generalized injuries arising out of the closure of Deaconess; they are alleging personalized

injuries arising out of GE's alleged failure to comply with the DIP Order.  For example, Saad

personally increased his guaranty liability by $250,000 specifically to obtain instant credit, of

which he is now personally liable.  (Doc. No. 1-2, at ¶22.)  Likewise, Nour, DRS, and DERS

each offered their accounts, accounts receivable, right to payment of any kind, and all proceeds

as collateral, of which they are too personally liable.  (Doc. No. 59, at ¶9.)  The court agrees that these injuries are distinct from any harm caused to the bankruptcy estate and thus, Plaintiffs are the proper parties to advance them.  Indeed, GE is unable to explain how the Trustee would be in any way responsible for the aforementioned guaranty and collateral liability, especially when the liability is personal and none of the Plaintiffs were parties to the bankruptcy case.

GE counters that the language in the Stipulated Final Judgement in the bankruptcy adversary proceeding was nonetheless sufficiently broad enough to dispose of the instant claims. The Stipulated Final Judgment, which incorporated by reference the bankruptcy settlement, stated, in pertinent part, "[a]ll claims which are asserted or which could have been asserted in this Adversary Proceeding by Plaintiffs, or any of them, against Defendant GE HFS Holdings, Inc. are dismissed with prejudice."  See In re: Deaconess Hosp., Case No. 04-1319, Doc. No. 79. Under GE's interpretation, because the instant claims "could have been asserted in this Adversary Proceeding by Plaintiffs," the Stipulated Final Judgment disposed of them as well. This court disagrees.  Because the alleged harms in the instant case are personal to Saad, Nour, DRS, and DERS, none of whom were parties to the adversary proceeding, the court does not see how their claims "could have been asserted" by the debtor plaintiffs.

The language of the Settlement Term Sheet, which was incorporated by reference in the Stipulated Final Judgment, supports this conclusion:

> The GE Creditors will be released *by the Trustee* . . . from all claims, demands, damages, and liabilities of any kind allegedly arising from or related in any way to the pre-petition and/or post-petition loan and/or leasing transactions involving any of the GE Creditors and *any of the Debtors* and/or their estates, including, but not limited to all claims, demands, damages, and liabilities of any kind allegedly arising from or related in any way to the post-petition DIP Financing Stipulation and related DIP Financing Order and the closure of Deaconess Hospital, and further including, but not limited to, any alleged avoidance claims under any provisions of the

-8-

Bankruptcy code or any provisions of applicable state law.

*The Trustee* . . . will stipulate with the GE Creditors to dismiss with prejudice all litigation now pending or that may be filed against any of the GE Creditors *by the Debtors' estates*, including but no limited to, the pending equitable subordination adversary proceeding.

The release and dismissal provisions in favor of the GE Creditors, as provided above in subparagraphs 3(d) and 3(e), will be sufficiently broad to resolve, fully and finally, all disputes involving, or that may involve, any of the GE Creditors with respect to the Bankruptcy Cases, including, but not limited to, all such disputes of any of the GE Creditors *with any of the Debtor's estates*, . . . all such disputes with respect to the closure of Deaconess Hospital.  In particular, and without limitation, the Trustee will claim ownership *by the Debtors' estates* of all claims, demands, damages, and liabilities against any of the GE Creditors allegedly arising from or related in any way to any of the GE Creditors' pre-petition and/or post-petition loan and/or leasing transactions *with any of the Debtors*, including, without limitation, any such matters arising from or related in any way to the DIP Financing Stipulation, the related DIP Financing Order, and the closure of the Deaconess Hospital, and will release all of those alleged claims, demands, damages, and liabilities to the full extent of such ownership *by the Debtors' estates*.

(Doc. No. 49-31, at ¶¶3(d)-(f) (emphasis added.))  Clearly, the Settlement Term Sheet only contemplated the release of GE's liability with respect to claims that could have been brought *by the debtor plaintiffs alone*.  Because the instant claims are personal to Plaintiffs, who were not parties to the aforementioned settlement, the court cannot conclude that the Stipulated Final Judgment served to dispose of their claims as well.  Indeed, Paragraph Seven of the Settlement Term Sheet expressly states:

The GE Creditors' participation in the Settlement *does not require Dr. Saad and the non-debtor entities suing GE HFS in the United States District Court for the Northern District of Ohio, Eastern Division (the "District Court") to release whatever claims they assert.*  It is, however, the position of GE HFS that the Trustee's release of the GE Creditors and the dismissal with prejudice of the equitable subordination litigation (all as provided in paragraph 3 above) are completely dispositive of the District Court litigation.

(Doc. No. 49-31, at ¶7 (emphasis added.))  Paragraph Seven goes on to preserve GE's right to

-9-

pursue its claims under the DIP Order.  Id.  Accordingly, the court finds GE's position untenable, that the bankruptcy settlement preserved all of *its claims* against Plaintiffs, but somehow disposed of all of *their claims* against it, especially when none of the instant Plaintiffs were parties to that agreement.

For similar reasons, GE's res judicata argument is not well taken.  The doctrine of res judicata has four elements:

(1) A final decision on the merits in the first action by a court of competent jurisdiction;
(2) The second action involves the same parties, or their privies, as the first;
(3) The second action raises an issue actually litigated or which should have been litigated in the first action; and
(4) An identity of the causes of action.

Begala v. PNC Bank, Ohio, N.A., 214 F.3d 776, 779 (6th Cir. 2000) (citing Sanders Confectionery Prods., Inc. v. Heller Financial, Inc., 973 F.2d 474, 480 (6th Cir. 1992)).  Here, there was no final decision on the merits.  Although the bankruptcy judge dismissed all claims that were asserted or "could have been asserted" in the adversary proceeding, this court has already concluded that the instant claims could not have been asserted by the debtor plaintiffs.

Moreover, the bankruptcy judge never made a final decision on the merits.  Rather, she concluded that the debtor companies were *unlikely* to succeed on the merits.  See In re: Deaconess Hosp., LLC, et al., Case No. 03-25461, Doc. No. 978 (Bnkr. N.D. Ohio Jul. 25, 2005).  Indeed, when considering a proposed bankruptcy settlement, the bankruptcy judge is charged with making a reasoned evaluation of the case, *but to stop short of trying the case on the merits*.  See generally In re W.T. Grant Co., 669 F.2d 599, 608 (2d Cir. 1983) (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972)).  Thus, no final decision on the merits has taken place.  The court need not address the remaining res judicata factors.

-10-

Because the instant claims are not owned by the bankruptcy estate, are not covered by the bankruptcy settlement, and are not barred by the doctrine of res judicata, the court will address them on their merits.


**B.    Merits Analysis**

Plaintiffs' claims rest on the assumption that upon signing the DIP Stipulation, they were immediately entitled to the additional $250,000.00 of post-petition financing.  See e.g. Compl., at ¶¶38, 66.  GE responds that no such obligation existed and maintains that the DIP Stipulation merely made the additional financing *available* pursuant to the terms of the pre-petition Loan Agreements.  Because the DIP Stipulation has an integration clause, Ohio law limits the court's analysis to the four corners of the agreement.  See Astor v. International Bus. Machs. Corp., 7 F.3d 533, 539 (6th Cir. 1993) (internal quotations omitted).[3]

Under Ohio law, "'[t]he purpose of contract construction is to effectuate the intent of the parties,' and that intent 'is presumed to reside in the language they chose to employ in the agreement.'" State ex. re. Petro v. R.J. Reynolds Tobacco Co., 104 Ohio St. 3d 559, 564 (2004) (quoting Kelly v. Medical Life Ins. Co., 31 Ohio St. 3d 130, 132 (1987)).  Also, "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of the contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." Layne v. Progressive Pereferred Ins., 104 Ohio St. 3d 509, 511

---

[3]    The integration clause states, "This stipulation sets forth the entire understanding of the parties hereto with respect to the matters described herein, and cannot be modified except in a writing signed by the parties and approved by the Court." (Doc. No. 49-16, at ¶26.)

-11-

(2004) (quoting Ed Schory & Sons v. Francis, 75 Ohio St. 3d 433, 440 (1996)).

Because neither party maintains that the DIP Stipulation is vague and ambiguous, the court is required to enforce its terms as written.  See Ledyard v. Auto-Owners Mut. Ins. Co., 137 Ohio App. 3d 501, 505 (8thApp. Dist 2000) (quoting Nationwide Mut. Ins. Co. v. Finkley, 112 Ohio App. 3d 712, 715 (9th App. Dist. 1995)).

Nothing in the DIP Stipulation supports Plaintiffs' argument that GE had an obligation to immediately advance the post-petition financing.  Instead, the DIP Stipulation indicates that "GE has agreed in good faith *to consider*, providing additional funding to the Initial Borrowers and provide funding to Indoga, *subject to the terms set forth in the [pre-petition Loan] Agreements as modified by the terms of this Stipulation*."  (Doc. No. 49-16, at ¶H (emphasis added.))  The only relevant modification of the pre-petition Loan Agreements with respect to financing was to increase the amount *available* from $100,000.00 to $250,000.00.  Id. at ¶30(a).  Otherwise, the DIP Stipulation is quite clear that "all terms and conditions of the [pre-petition Loan] Agreements remain in full force and effect."  Id. at ¶31.  Thus, under the express terms of the DIP Stipulation, Plaintiffs were still required to comply with their obligations under the pre-petition Loan Agreements prior to securing any cash advancement. See id. at ¶¶6, 20.

Those obligations, with respect to DRS and DERS, are set forth in the original Loan Agreement and Amendment Eight to that Agreement.[4]  (Doc. Nos. 49-3, 49-11.)  Pursuant to the

---

[4]    Although the DIP Stipulation is governed by Ohio law, the underlying Loan Agreements are governed by Maryland law.  (Doc. No. 49-11, at ¶10.)  However, the law with regard to contract interpretation is the same: plain and unambiguous terms are to be enforced as written and "will not give away to what the parties thought that the agreement meant or intended it to mean."  Calomiris v. Woods, 353 Md. 425, 436 (Md. Ct. App. 1999) (quoting General Motors Acceptance Corp. v. Daniels, 303 Md. 254, 261 (Md. Ct. App. 1985)).

original Loan Agreement, a borrower is only entitled to borrow according to a specified

Borrowing Base Formula, which factors in, *inter alia*, the borrower's "Qualified Accounts."

(Doc. No. 49-3, at ¶2.1(d)).

On October 9, 2003, when the parties executed Amendment Eight, the parties agreed and

acknowledged that GE:

> has not completed its due diligence of New Borrower, and therefore, the Accounts
> of New Borrower shall not be deemed to be Qualified Accounts, and consequently,
> such Accounts shall not be included in the Borrowing Base, unless and until Lender
> has determined, in its sole and absolute discretion, to include New Borrower's
> Accounts, or a portion thereof, in the Borrowing Base.

(Doc. No. 49-11, at ¶2.2.)  Because DRS and DERS did not request any advances against their

accounts prior to seeking the post-petition financing on November 26, 2003, GE had still not yet

made a determination as to whether their accounts constituted "Qualified Accounts."  Such a

determination was necessary prior to advancing the $250,000.00.  Id.

Upon receiving the request for post-petition financing, GE Senior Vice President Richard

Arrowsmith and Account Manager Rahm Dvir found several deficiencies in the Aging that

accompanied the request: (1) the suspicious use of an Excel Spreadsheet that was created and

presented by someone independent from the Accounts management system, (2) the abnormal

migration of over $835,000 of accounts, which instead should have been collected and deposited

into the lockbox account created under the Loan Agreement, and (3) the inclusion of Medicare

and Medicaid Accounts for periods prior to the time when DRS and DERS had obtained

Medicare/Medicaid provider agreements.  (Arrowsmith Decl., at ¶ 49; Dvir Decl., at ¶ 14.)

These deficiencies were never explained nor corrected despite requests from GE for further

clarification.  Because of these deficiencies, GE could not determine whether the accounts of

-13-

DRS and DERS constituted "Qualified Accounts" and thus, it did not approve the post-petition

financing.  After careful consideration of the multiple documents at issue, the court concludes

that GE, as a matter of law, was well within its rights under the various agreements to do so.

In short, nothing in the DIP Stipulation, Amendment Eight, or the Loan Agreement

indicate that GE had an obligation to immediately advance Plaintiffs $250,000.00.[5]  Plaintiffs

nonetheless maintain that it was GE's *intention* to immediately advance the post-petition

financing.  The only evidence they cite to support this allegation are two affidavits by Saad and

Daniel A. DeMarco (counsel for the debtor plaintiffs), both of whom state that it was their

understanding based on conversations with GE prior to executing the DIP Stipulation, that the

post-petition financing had already been pre-approved.  (Doc. Nos. 54-1, 51-5.)  However,

because the DIP Stipulation contains an integration clause, those intentions "are deemed to have

no existence and may not be shown by parol evidence."  Astor, 7 F.3d at 539.

The only response by Plaintiffs in their brief in opposition is that pursuant to the DIP

Stipulation, GE was supposed to consider any request for post-petition financing in good faith.

See DIP Stipulation, at ¶H.  According to Plaintiffs, it did not.  However, the notions of good

faith and fair dealing cannot be used to override the express terms of a contract.  See Stephenson

v. Allstate Ins. Co., 328 F.3d 822, 826-27 (6th Cir. 2003); Hamilton Ins. Serv., Inc. v.

Nationwide Ins. Cos., 86 Ohio St. 3d 270, 274 (1999).  As the Ohio Supreme Court recognized:

> Although courts often refer to the obligation of good faith that exists in every
> contractual relation, . . . this is not an invitation to the court to decide whether one
> party ought to have exercised privileges expressly reserved in the document.  "Good

---

[5]     The debtor plaintiffs admit that no one "ever state[d] to the [Bankruptcy] Court
that the DIP Financing would provide any special or unconditional commitment
to loan the Debtors $250,000 automatically upon entry of the DIP Order."  (Doc.
No. 49-24, Req. No. 21.)

-14-

faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.

Ed Schory & Sons v. Francis, 75 Ohio St. 3d 433, 443 (1996).

Here, the parties clearly contemplated the possibility that the post-petition financing would not be approved.  Indeed, GE only agreed to *consider* the post-petition financing, "subject to the terms set forth in the Agreements as modified by the terms of this Stipulation."  (Doc. No. 49-16, at ¶H.)  When referring to those Agreements, it is quite clear that no due diligence had taken place and that GE had sole and absolute discretion in determining whether DRS and DERS had "Qualified Accounts" to borrow against.  (Doc. No. 49-11, at ¶2.1.)  In evaluating Ohio law, this court is drawn to the inescapable conclusion that when a party exercises its rights according to the written terms of a contract, it cannot be said to be acting in bad faith and any alleged promises that contradict those terms cannot be taken into consideration.  See Astor, 7 F.3d at 539; Hamilton, 86 Ohio St. 3d at 274; Ed Schory, 75 Ohio St. 3d at 443.  Moreover, the fact that GE funded a $512,000.00 advance to Plaintiffs on November 26, 2003, under a separate account undercuts any allegation that GE was acting in bad faith.  Indeed, Plaintiffs admit that the $512,000.00 was sufficient to pay in full the November 28, 2003 payroll.  Compl., at ¶26.

The fact that Plaintiffs have also alleged promissory estoppel and fraudulent inducements claims does not change this court's conclusion.  As the Ohio Supreme Court held, "the parol evidence rule may not be avoided by a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise, the terms of which are directly contradicted by the signed writing."  Galmish v. Cicchini, 90 Ohio St. 3d 22, 29 (2000) (internal quotation omitted).  Indeed, under Ohio law, it is well-established:

-15-

A person of ordinary mind cannot say that he was misled into signing a paper which was different from what he intended to sign when he could have known the truth merely by looking when he signed. . . . If this were permitted, contracts would not be worth the paper on which they were written.

Id. (Quoting Dice v. Akron, Canton, & Youngstown RR. Co., 155 Ohio St. 185, 191 (1952)).

Similarly, a party cannot maintain a promissory estoppel claim in the face of a written contract that is based on alleged representations not included therein.  Board of Tr. of Union Township, Ohio v. Planned Dev. Co. of Ohio, 2000 Ohio App. LEXIS 5780, 23 (Dec. 11, 2000).[6]

## IV.    CONCLUSION

For the foregoing reasons, GE's motion for summary judgment (Doc. No. 48) is **GRANTED**.  The complaint is hereby dismissed, with prejudice, the counterclaim remains pending.

IT IS SO ORDERED.

_____/s/ Ann Aldrich_____

UNITED STATES DISTRICT JUDGE

Dated:  September 21, 2006

---

[6]        The court also recognizes that the bankruptcy judge concluded, after reviewing these very claims, that Plaintiffs were unlikely to succeed on the merits.  (Doc. No. 49-32, at 12.)

-16-