UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

GEORGE J. SAAD, et al.,           )
                                  )          Case No. 1:03-CV-02557
        Plaintiffs,               )
                                  )          JUDGE ANN ALDRICH
    v.                            )
                                  )
GE HFS HOLDINGS, INC.,            )
                                  )
        Defendant.                )          MEMORANDUM AND ORDER
                                  )
                                  )
                                  )
                                  )

The matter before this court is GE HFS Holdings, Inc.'s ("GE HFS") motion for summary judgment (Doc. No. 67) on its counterclaim against George Saad ("Dr. Saad"), Nour Management Company ("Nour"), Deaconess Radiological Services, Inc. ("DRS"), and Deaconess Emergency Room Services, Inc. ("DERS") (collectively, Nour, DRS, and DERS are referred to as "the Plaintiff Companies" and with Dr. Saad are referred to as "the Counterclaim Defendants"). On February 26, 2007, the Counterclaim Defendants filed a response (Doc. No. 75), and on March 13, 2007, GE HRS filed a reply (Doc. No. 78).

On August 16, 2007, this court partially denied GE HFS' motion for summary judgment by finding that GE HFS was constructively paid the $400,000 which it sought to collect through its counterclaim. (Doc. No. 87). This court, however, requested further briefing before deciding on the issue of the attorneys' fees and costs that GE HFS also sought to collect. GE HFS filed supplemental briefs on the issue of fees and costs on September 14, October 19, and November 9, 2007. (Doc. Nos. 87-90, 94, 96). Counterclaim Defendants submitted supplemental briefs on October 5 and November 2, 2007 (Doc. Nos. 93, 95). For the following reasons, GE HFS' motion

for summary judgment on the issue of attorneys' fees is granted.

**I. Background**

After nearly six years of litigating this case in three suits, the parties are well acquainted with the facts.  After Deaconess Hospital (the "hospital") filed for bankruptcy, Dr. Saad created a new Deaconess Hospital LLC ("Deaconess"), which entered into a loan agreement (the "Loan Agreement") with GE HFS so that Deaconess could purchase all of the hospital's assets.  Deaconess, Pearlview Square Inc. ("Pearlview"), and Nour. (collectively, Deaconess, Pearlview, and Nour are referred to as the "Debtor Companies") were provided a $3,000,000 revolving line of credit through a  revolving credit note (the "Revolving Credit Note"), which was later increased to $4,500,000.  The revolving credit line was secured by property owned by Pearlview and a personal guaranty by Dr. Saad of $750,000 (the "Personal Guaranty").  Over time, many amendments were made to the Loan Agreement as well as to the Personal Guaranty.  On October 9, 2003, the parties executed an eighth amendment ("Amendment Eight") to the Loan Agreement, which made DRS and DERS borrowers under the Loan Agreement and gave GE HFS a security interest in their accounts and accounts receivable.  (Doc. No. 67, Exhibit 9).  At that time, Dr. Saad ratified and confirmed his previous Personal Guaranty with respect to Amendment Eight.  Like previous versions of the Loan Agreement, this final version of the Loan Agreement contained an attorneys' fee provision.  Specifically, the Loan Agreement provided that:

> Borrower also agrees to pay all out-of-pocket charges and expenses reasonably incurred by Lender (including the reasonable fees and expenses of Lender's counsel) in connection with the enforcement, protection or preservation of any right or claim of Lender, the termination of the Agreement, the termination of any liens of Lender on the Collateral, and the collection of any amounts due under the Loan Documents.

(Doc. No. 67, Exhibit 1).  Similarly, the revolving credit note also provided that:

2

> Each party liable on this Note in any capacity, whether as maker, endorser, surety, guarantor or otherwise . . . (v) agrees to pay, in addition to all other sums of money due, all costs of collection and reasonable attorney's fees, whether suit be brought or not, if this Note is not paid in full when due, whether at the stated maturity or by acceleration.

(Doc. No. 67, Exhibit 15).  Finally, the Personal Guaranty signed by Dr. Saad states:

> In addition to its guarantee of Borrower's payment of the Overline Obligations and Borrower's performance of all covenants, obligations, and agreements contained in the Loan Documents, Guarantor shall pay all actual costs and expenses (including reasonable attorney's fees) paid or incurred by Lender in connection with the enforcement of this Guaranty.

(Doc. No. 67, Exhibit 24).

Despite efforts by Dr. Saad, the hospital generated operating losses and the Debtor Companies filed for bankruptcy on November 21, 2003.  After the bankruptcy petition was filed (the "Bankruptcy Cases"), the bankruptcy court signed an order (the "DIP Order") approving an emergency stipulation (the "DIP Stipulation") so that Deaconess could obtain an additional $250,000 from GE HFS to pay for the hospital's operating expenses, which was conditioned upon a re-commitment by Dr. Saad to personally guarantee the debt up to $1,000,000 (the "Revised Personal Guaranty").  Like the Loan Agreement, the DIP Stipulation also provided for attorneys' fees:

> The Borrowers shall reimburse GE, or GE may at its option may [sic] charge any account of the Borrowers maintained with GE, for all attorney's fees and/or costs incurred by GE in connection with these Chapter 11 cases, including, but not limited to, the negotiation, preparation, administration or enforcement of the Agreements and/or this Stipulation. Notwithstanding the foregoing, the allowance and payment of attorney's fees and costs is subject to Court approval.

(Doc. No. 67, Exhibit 26).  The DIP Order reiterated the Borrowers' obligation for attorneys' fees to GE HFS:

> The Debtors are authorized to borrow and spend monies in accordance with the Agreements and are further authorized and directed to do and perform all acts, to make, execute, and

3

> deliver all instruments necessary for their performance, including, without limitation: . . . (c) [t]he reimbursement to GE of its reasonable costs and expenses including, without limitation, all of its attorney's fees and disbursements required by the terms of the Agreements and/or the Stipulation.

(Doc. No. 67, Exhibit 27).  Despite the agreement, GE HFS did not provide the post-petition financing and the hospital was forced to cease operations on November 29, 2003.

On December 3, 2003, GE HFS declared Deaconess in default of its obligations and delivered a demand letter to  Dr. Saad to pay the full amount of the Revised  Personal Guaranty. On December 12, 2003, the Counterclaim Defendants filed suit in the Court of Common Pleas for Cuyahoga County, claiming that GE HFS had violated its obligations under the DIP Stipulation and DIP Order by not providing the additional $250,000 necessary to maintain the hospital's operations. The Counterclaim Defendants requested compensatory and punitive damages; attorneys' fees, interest and costs; and injunctive relief enjoining GE HFS from "any action to obtain possession of or otherwise sell or dispose of the [collateral] until Plaintiff's claims against GE are determined . . . ."  The case was removed by GE HFS to federal court on December 12, 2003 (the "District Court Litigation").  (Doc. No. 1).

On June 9, 2004, the Debtor Plaintiffs filed an adversary proceeding ("Adversary Proceeding") with the bankruptcy court raising various breach of duty, lender liability, and equitable subordination claims against GE HFS.  Although GE HFS considered consolidating the Adversary Proceeding with the District Court Litigation, it chose to allow the suits against it to proceed separately.

On July 25, 2005, the bankruptcy court resolved GE HFS and the Debtors Companies' disagreement on the amount of indebtedness as of the petition date.  The approved settlement term sheet (the "Settlement Agreement") stated:

4

The GE Creditors assert a Secured Claim and an Administrative Claim against the Debtors' estates; and those Claims currently total more than $4,900,000.00.  The claims of the GE Creditors consist of: (1) the GE HFS Secured Claim balance as of October 1, 2004 (immediately before the $3,500,000.00 payment to GE HFS on October 1, 2004) in the amount of $4,298,548.42; (b) all charges (including, but not limited to, continuing interest accruals, legal fees, and costs) that GE HFS has incurred and asserts that it is entitled to recover as part of its Secured Claim from and after October 1, 2004; and (c) a GE Med Administrative Claim of at least $77,489,54 arising from the Debtors' post-petition use of equipment leased from GE MED under leases subsequently rejected by the Debtors. Subject to all of the provisions of the Settlement, including specifically, but without limitation, the accommodations that the GE Creditors are willing to make in lieu of positions that they would assert in litigation, the GE HFS Secured Claim will be allowed under the Settlement as a Secured Claim against the Debtors' estates in the amount of $4,250,000.00; and the GE Med Administrative Claim will be allowed under the Settlement as an Administrative Claim against the Debtors' estates in the amount of $77,489.54.

In sum, the Settlement Agreement states that GE HFS asserted three claims against the Debtor Companies: a secured claim, an unsecured claim for charges, and an administrative claim.  These claims totaled more than $4.9 million, and the parties agreed that $4.25 million of that consisted of the secured claim.  This secured claim, as GE HFS recognizes in its briefs, included most of its attorneys' fees through October 1, 2004.  (Doc. No. 87).  The bankruptcy court and the Settlement Agreement, however, distinguished between the $4.25 million secured claim against the Debtor Companies and any remaining unsecured claim against the Counterclaim Defendants.  The settlement term sheet specifically provided that "[w]hile the GE Creditors covenant with the Debtors' estates not to seek further recovery from the Debtors' estates after GE HFS receives indefeasible payment of $3,850,000.00 . . . , the GE Creditors reserve and do not release their claims against Dr. Saad and the non-debtor entities."

The Settlement Agreement recognized pre-petition payments of $3.85 million and provided that GE HFS would agree not to seek recovery of the remaining $400,000 (the "carve out") of the $4.25 million secured claim, because the carve out would be paid to estate professionals to satisfy

GE HFS' obligations to Bank One, who provided the post-petition financing.  GE HFS, however, did not agree that the carve out constituted a payment of the remaining indebtedness, and it declared the Plaintiff Companies in default of their obligations under the Settlement Agreement, delivering a demand letter to Dr. Saad to pay the full amount of the Revised Personal Guaranty.  After the Counterclaim Defendants purportedly defaulted on their obligations under the DIP Stipulation and DIP Order, GE HFS filed a counterclaim on December 1, 2005 against the Counter Defendants to seek recovery of debts still outstanding, namely, the $400,000 carve out and the attorneys' fees and costs incurred in defending itself in the various actions.

On September 21, 2006, this court granted GE HFS's first motion for summary judgment and dismissed the Counterclaim Defendants' complaint with prejudice.  Specifically, the court found that "nothing in the DIP Stipulation, Amendment Eight, or the Loan Agreement indicate that GE had an obligation to immediately advance Plaintiffs $250,000.00." (Doc. No. 65).  On November 11, 2006, GE HFS filed a second motion for summary judgment on its counterclaim, claiming that the Plaintiff Companies still owed GE HFS the $400,000 carve out and attorneys' fees and claiming that Dr. Saad was liable under the Revised Personal Guaranty.  (Doc. No. 67).  On August 16, 2007, the court determined, in response to this second motion, that GE HFS had been constructively paid the contested $400,000 carve out.  The court determined that the $400,000 constructive payment fully satisfied the Debtor Companies' and Plaintiff Companies' obligations under the Loan Agreement and Settlement Agreement with regard to the $4,250,000 secured claim.  Thus, the court found, that, with regard to the secured claim, "the Plaintiff Companies have no remaining obligations to GE." (Doc. No. 67).

The court, however, recognized the possibility that unsecured debt remained outstanding in

the form of attorneys' fees and costs incurred by GE HFS in defending itself in the various actions. In the second motion for summary judgment, GE HFS also sought $961,388.10 in interest indebtedness, attorneys' fees, and costs from the Debtor Companies and claimed that Dr. Saad had personally guarantied up to $1,000,000 of GE HFS' remaining claims.  The court did not rule on this portion of GE HFS' motion for summary judgment, but requested that the parties submit additional briefs on the issue of attorneys' fees.  As of GE HFS' most recent briefing on the issue of attorneys' fees, GE HFS claims that its unsecured claim for fees and costs has grown to $1,084,458.31.

## II. Standard for Summary Judgment

Summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir.2004).  If the movant succeeds, the burden then shifts to the nonmoving party to demonstrate the existence of a material dispute as provided in Rule 56(e):

> An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED.R.CIV.P. 56(e); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Parties opposing summary judgment must go beyond the pleadings and produce some type of evidentiary material in support of their position.  *See Celotex*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, this court must view the evidence in a light most favorable to the nonmoving party.  *See Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 157 (1970); *Hamby v. Neel*, 368 F.3d 549, 556 (6th Cir.2004.  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Anderson*, 477 U.S. at 248.  An issue is "genuine" if the evidence is such that a reasonable juror "could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict" or whether the evidence is "so one-sided that [the moving party] must prevail as a matter of law." *Id.* at 252.  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III. Discussion

The Counterclaim Defendants have made two primary arguments in their briefings as to why they are not obligated to pay GE HFS' attorneys fees and costs.  First, they argue that the settlement payments of $4,250,000 extinguished all of GE HFS' claims against them.  Second, they argue that an award of attorneys' fees and costs would be improper under Ohio state law.

#### A. Whether a Deficiency Exists

The Counterclaim Defendants have repeatedly argued that their settlement payment of $4,250,000 completely satisfied all outstanding obligations owed to GE HFS.  Moreover, they have claimed that this court ruled as much on August 16, 2007 when it denied GE HFS' motion for summary judgment on the issue of the $400,000 carve out.  In support of this proposition, the Counterclaim Defendants cite to this court's finding that "the Plaintiff Companies have no remaining obligations to GE."

In so arguing, however, the Counterclaim Defendants ignore the fact that the court's language must be interpreted within the context of the dispute and the specific issue raised: whether

8

the $400,000 carve out was constructively paid in satisfaction of the *secured* claim.  This court ruled that constructive payment had occurred, that the secured claim was extinguished, and that "the Plaintiff Companies have no remaining obligations to GE" with respect to the *secured* claim.  This court did not make any representations about any *unsecured* claims that GE HFS might have against the Counterclaim Defendants.

Understood in the context of a dispute over the secured claim, this court's August 16, 2007 finding is entirely consistent with the bankruptcy court's order approving the Settlement Agreement. The bankruptcy court specifically distinguished between secured and unsecured claims and between the released claims against the Debtor Companies and the unreleased claims against the Counterclaim Defendants.  If the $4,250,000 secured claim was the only debt owed to GE HFS, the bankruptcy court would not have stated that "the GE Creditors reserve and do not release their claims against Dr. Saad and the non-debtor entities."  Moreover, if this court had found that the $4,250,000 secured claim was the only debt owed to GE HFS, it would not have requested further briefing on the issue of attorneys' fees.  Accordingly, GE HFS may show that there remains an unsecured claim for which the Counterclaim Defendants are liable.

GE HFS has submitted considerable evidence demonstrating the existence of unpaid attorneys' fees and costs in the amount of $1,085,458.13.  Namely, GE HFS has submitted fee statements through and including October 1, 2004 from Collins & Scanlon LLP, fee statements through and including October 1, 2004 from Pitney Hardin, and fee statements from October 1, 2004 through and including September 30, 2006 from Quarles & Brady LLP.

The Counterclaim Defendants have expressed one main objection to GE HFS' calculation

9

of these attorneys' fees and costs.[1]  The Counterclaim Defendants claim that if GE HFS is entitled to fees and costs at all, it is only entitled to those fees and costs that have accrued since the parties settled on July 25, 2005, or $271.297.21.  This argument, however, rests on the incorrect assumption that the Settlement Agreement included all fees and costs incurred by GE HFS through the date of the settlement on July 25, 2005.  The Settlement Agreement, however,  only included as part of the secured claim those fees and costs incurred through October 1, 2004.  It did not release GE HFS from its claims against the Counterclaim Defendants for fees incurred after October 1, 2004 but before July 25, 2005.

The documentation submitted by GE HFS undisputably show that attorneys' fees and costs in the Bankruptcy Cases, the Adversary Proceeding, and the District Court Litigation totaled $1,545,276.01.  GE HFS has clearly showed that the settlement payment of $4,250,000 satisfied outstanding principal, interest, other recoverable costs and charges, and all but $47,667.78 in legal fees through October 1, 2004.  A deficiency, therefore, exists for the $47,667.78 in legal fees that GE HFS incurred prior to October 1, 2004.  A deficiency also exists for all legal fees and costs incurred by GE HFS after October 1, 2004, or $1,037,790.35.  In total, GE HFS has shown that a total deficiency of $1,085,458.13 exists for which it can collect if the attorneys' fees provisions are enforceable against the Counterclaim Defendants.

### B. Whether the Counterclaim Defendants are Liable under Ohio Law

Under current interpretations of the Bankruptcy Code, "creditors are entitled to recover

---

[1]The Counterclaim Defendants also assert a minor objection to GE HFS' calculation of its fees and costs by claiming that GE HFS' submitted documentation is inconsistent.  In particular, they claim that the April 2005 entry in GE HFS' table of fees and costs does not match the corresponding April 2005 invoice. GE HFS noted the discrepancy and submitted an omitted invoice that resolved the discrepancy.  Accordingly, GE HFS' calculations are now consistent throughout the filings.

attorney's fees in bankruptcy claims if they have a contractual right to them valid under state law. . . . The validity of the creditor's claim for attorney's fees does not depend on whether the obligation is secured (unless state law so provides)." *In re Martin* , 761 F.2d 1163, 1168 (6th Cir.1985) (citing *In re United Merchants & Manufacturers*, 674 F.2d 134, 137 (2d Cir.1982))(citations omitted). As is set forth below, Ohio state law enforces such contractual obligations for reasonable attorneys' fees without distinguishing between secured and unsecured claims.

## 1. Attorneys' Fees and Ohio Public Policy

Although the Loan Agreement designates Maryland law as governing, the parties agree that Ohio law controls the enforceability of the relevant attorneys' fees provisions. The Counterclaim Defendants claim that attorneys' fees provisions are void under Ohio law as a matter of public policy. In analyzing questions of Ohio state law, this court "must apply state law in accordance with the controlling decision of the highest court of the state." *See Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir.1999).

Nearly 170 years ago, the Ohio Supreme Court found that contractual terms requiring the payment of attorney fees "are against the public policy of the country, and ought not to be enforced in courts of justice." *State v. Taylor*, 10 Ohio 378, 381 (1841). In 1911, the Ohio Supreme Court reaffirmed the *Taylor* court in *Miller v. Kyle*, 85 Ohio St. 186 (1911): "It is the settled law of this state that stipulations incorporated in promissory notes for the payment of attorney fees, if the principal and interest be not paid at maturity, are contrary to public policy and void." 85 Ohio St. at 186, paragraph one of the syllabus. Enforcing contracts that contained attorneys' fees provisions, the *Miller* court found, undermined the state's usury laws and encouraged litigiousness. *Id.* at 192-

193.

The rule articulated in *Taylor* and *Miller*, however, is qualified.  In *Worth v. Aetna Casualty & Surety Co.*, 32 Ohio St. 3d 238 (1987), the Ohio Supreme Court found the decision in *Miller* to be inapplicable where an attorney fee provision in an indemnification agreement was arrived at "through free and understanding negotiation" and where both parties "were able to protect their respective interests."  32 Ohio St.3d at 243.  The *Worth* court specifically distinguished negotiated agreements from ordinary debt instruments:

> When a stipulation to pay attorney fees is incorporated into an ordinary contract, lease, note or other debt instrument, it is ordinarily included by the creditor or a similar party to whom the debt is owed and is in the sole interest of such party.  In the event of a breach or other default on the underlying obligation, the stipulation to pay attorney fees operates as a penalty to the defaulting party and encourages litigation to establish either a breach of the agreement or a default on the obligation.  In those circumstances, the promise to pay counsel fees is not arrived at through free and understanding negotiation.  *Id.* at 242-243.

In *Nottingdale Homeowners' Assn., Inc. v. Darby*, 33 Ohio St.3d 32 (1987), the Ohio Supreme Court again distinguished between negotiated agreements and ordinary debt instruments.  In *Nottingdale*, the court enforced a condominium association's contractual requirement that owners pay attorneys' fees in the event of foreclosure.  "*Miller* is factually a far cry from the case now before us which involves a specific contractual provision that was assented to in a non-commercial setting by competent parties with equal bargaining positions and under neither compulsion or duress."  *Id.* at 35.

In sum, "*Worth* and *Nottingdale* [carve] out an exception to *Miller* where the parties have equal bargaining positions, and the promise to pay attorneys' fees is arrived at through free and understanding negotiation . . . .  Ohio courts and federal courts sitting in Ohio have reached this same conclusion.  *Chase Manhattan Mortgage Corp. v. Tudor*, No. 2:06cv26, 2007 WL 4322187,

at *5 (S.D. Ohio Dec. 7, 2007).

Here, it is clear from the record that the parties' bargaining positions were not unequal.  The record shows that Dr. Saad is a sophisticated medical professional and business man.  He was represented by counsel while negotiating the relevant transactions.  He agreed to important amendments and negotiated his own amendments during the course of the events described.  Furthermore, he has presented no evidence to suggest that he entered into the agreements from a position of unequal power.  The attorneys' fees provisions, therefore, were not invalid as contrary to Ohio public policy.

### 2. Attorneys' Fees Pursuant to Ohio Revised Code § 1301.21

The general rule against attorneys' fees articulated in *Taylor* and *Miller* was further abrogated by statute through Ohio Revised Code § 1301.21, which governs the enforcement of a commitment to pay attorneys' fees in commercial contracts of indebtedness.  Section 1301.21(B) allows for an award of attorney fees, provided that (1) the parties entered into a contract of indebtedness, (2) the contract includes a commitment to pay attorneys' fees; (3) the contract is enforced through judicial proceedings or otherwise after maturity of the debt; (4) the total amount owed on the contract of indebtedness at the time the contract was entered into exceeds $100,000; and (5) the obligation is for a "reasonable" amount.   OHIO REV. CODE ANN. § 1301.21 (West 2008).

### i. Contract of Indebtedness

According to the statute, a "'[c]ontract of indebtedness' means a note, bond, mortgage, conditional sale contract, retail installment contract, lease, security agreement, or other written evidence of indebtedness, other than indebtedness incurred for purposes that are primarily personal, family, or household."  OHIO REV. CODE ANN. § 1301.21(A)(1).

13

It is clear from the evidence before this court that a contract for indebtedness existed. Nour was an original party to the Loan Agreement, and DRS and DERS became parties through Amendment Eight when they provided GE HFS with a security interest in their accounts. In approving the DIP Stipulation and issuing the DIP Order, the indebtedness accrued under Loan Agreement included the attorneys' fees and costs. Moreover, up to $1,000,000 of this debt was personally guarantied by Dr. Saad pursuant to the Revised Personal Guaranty. Because this debt was incurred primarily for a commercial purpose, a contract for indebtedness within the meaning of § 1301.21 existed at the time that the parties agreed to the Loan Agreement and the Revised Personal Guaranty.

The Counterclaim Defendants argue that no indebtedness existed at the time of the Settlement Agreement, but this court finds that whether a claim was outstanding at the time of the settlement is irrelevant. The statute merely requires that a contract of indebtedness existed at some time, and GE HFS must only show that the Loan Agreement and the Revised Personal Guaranty were contracts that indebted the Counterclaim Defendants to GE. This fact is uncontested by the parties. GE HFS has, therefore satisfied its burden in proving that a contract of indebtedness exists.

### ii. Containing a Commitment to Pay Attorneys' Fees

The statute defines a "[c]ommitment to pay attorneys' fees" as " an obligation to pay attorneys' fees that arises in connection with the enforcement of a contract of indebtedness." OHIO REV. CODE ANN. § 1301.21(A)(2). The parties do not contest that the Loan Agreement, the DIP Stipulation, and the DIP Order each contain an obligation by the Counterclaim Defendants to pay GE HFS' attorneys' fees. According to the Loan Agreement:

14

Borrower also agrees to pay all out-of-pocket charges and expenses reasonably incurred by Lender (including the reasonable fees and expenses of Lender's counsel) in connection with the enforcement, protection or preservation of any right or claim of Lender, the termination of the Agreement, the termination of any liens of Lender on the Collateral, and the collection of any amounts due under the Loan Documents.

Moreover, the revolving credit note stated:

Each party liable on this Note in any capacity, whether as maker, endorser, surety, guarantor or otherwise . . . (v) agrees to pay, in addition to all other sums of money due, all costs of collection and reasonable attorney's fees, whether suit be brought or not, if this Note is not paid in full when due, whether at the stated maturity or by acceleration.

Dr. Saad also agreed to the attorneys' fee provision by signing the Personal Guaranty:

In addition to its guarantee of Borrower's payment of the Overline Obligations and Borrower's performance of all covenants, obligations, and agreements contained in the Loan Documents, Guarantor shall pay all actual costs and expenses (including reasonable attorney's fees) paid or incurred by Lender in connection with the enforcement of this Guaranty.

Furthermore,  the DIP Stipulation stated:

The Borrowers shall reimburse GE, or GE may at its option may [sic] charge any account of the Borrowers maintained with GE, for all attorney's fees and/or costs incurred by GE in connection with these Chapter 11 cases, including, but not limited to, the negotiation, preparation, administration or enforcement of the Agreements and/or this Stipulation. Notwithstanding the foregoing, the allowance and payment of attorney's fees and costs is subject to Court approval.

Finally, the DIP Order found

The Debtors are authorized to borrow and spend monies in accordance with the Agreements and are further authorized and directed to do and perform all acts, to make, execute, and deliver all instruments necessary for their performance, including, without limitation: . . . (c) [t]he reimbursement to GE of its reasonable costs and expenses including, without limitation, all of its attorney's fees and disbursements required by the terms of the Agreements and/or the Stipulation.

15

When this evidence is viewed in a light most favorable to the Counterclaim Defendant, it is clear that there is no genuine issue of material fact as to whether the contract contained a commitment to pay attorneys' fees.  GE HRS has, therefore, satisfied its burden in proving this element of the statute.

### iii. Enforced through Judicial Proceedings or Otherwise after Maturity of the Debt

For an attorneys' fee provision to be valid under Ohio law, the contract of indebtedness must be "enforced through judicial proceedings or otherwise after maturity of the debt . . . ."  OHIO REV. CODE ANN. § 1301.21(B).  It is clear, in this case, that the debt had matured.  The statute states that "'[m]aturity of the debt' includes maturity upon default or otherwise." *Id.* at § 1321.21(A)(3).  Here, the parties both acknowledge that the Counterclaim Defendants defaulted on their obligations under the Loan Agreement in 2003.  The Counterclaim Defendants attempt to argue that they were current in their obligations under the Settlement Agreement, but the Settlement Agreement is not the relevant document for this analysis.  It is the Loan Agreement and the Revised Personal Guaranty that constitute the relevant "contract of indebtedness."

The parties disagree as to whether the attorneys' fees and costs incurred by GE HFS were incurred in the enforcement of the contract.  GE HFS claims that it has enforced or is enforcing the Loan Agreement and DIP Order through judicial proceedings in the Bankruptcy Cases, the Adversary Proceeding, and the District Court Litigation.  GE HFS argues that "GE HFS' efforts in each of those cases relate the enforcement of its claim against the jointly and severally obligated [Counterclaim Defendants] or to GE HFS' necessary defense of its claim against attacks orchestrated by Dr. Saad so that GE HFS would have a claim to enforce."  (Doc. No. 94).  The Counterclaim Defendants agree that the Bankruptcy Cases and Adversary Proceeding constitute enforcement of

the Loan Agreement through Judicial Proceeding, but they argue that District Court Litigation does not relate to the enforcement of the contract of indebtedness.  Rather the fees and costs incurred in the District Court Litigation "all relate to adjudicating the issue of whether the DIP Order required GE to provide post-petition lending" and do not relate to enforcing the collection of any debt.  (Doc. No. 93).

This court finds that GE HFS' defense and counterclaim in the District Court Litigation both relate to enforcement of the contract of indebtedness.  In *Duryea v. Third Northwestern Nat'l Bank of Minneapolis*, 606 F.2d 823, 825 (8th Cir. 1979), the Eighth Circuit held that finding otherwise would lead to an undesirable result:

> If the Bank had instituted suit to collect the note and plaintiff had, by way of counterclaim, served the complaint that is the basis of this action, all costs of both bringing suit and defending against the counterclaim would be "costs of collection" of the note.  This court sees little difference where plaintiff brings suit to Prevent collection of the note. Because it is necessary for the Bank to defend against such an action in order to collect on the note, attorney's fees incurred in defending against plaintiff's suit are a "cost of collection" as that term is used in the note. A contrary result would permit the maker of a note by winning the "race to the courthouse" to coerce settlement. This would render the "cost of collection" provision of little value, apparently contrary to what the parties to the note intended.  *Id.* at 826.

Other circuits have similarly held that defending an action in order to collect on a note constitutes a cost of collection or enforcement.  *See, e.g., Univ. Drilling Co. V. Camay Drilling Co.*, 737 F.2d 869, 875-77 (10th Cir. 1984).  Here, the Counterclaim Defendants pursued the District Court Litigation to seek damages as well as an injunction that would prevent the enforcement of the contract of indebtedness.  Specifically, the Counterclaim Defendants sought:

> [A] temporary, preliminary and permanent injunction enjoining and restraining GE, its agents, attorneys, successors and assigns and all those in active concert or participation from exercising the warrant of attorney contained in the Amended Guaranty in order to prevent GE from seeking and obtaining judgment on the Amended Guaranty against Plaintiffs or taking any action to obtain possession of or otherwise sell or dispose of the Assets until

> Plaintiffs' claims against GE are determined so as to prevent GE from obtaining the benefit of the benefit [sic] of its fraud in the inducement or Plaintif's' detrimental reliance upon GE's promises. GE should be compelled to assert its claims, if any, against Plaintiffs as a compulsory counterclaim in this action . . . .

The injunction sought by the Counterclaim Defendants would constitute a total restriction on GE HFS' ability to sell or dispose of its collateral. As such, GE HFS' decision to defend itself against such a restriction is related to its enforcement of the original debt obligation and protective of its rights under the Loan Agreement and Revised Personal Guaranty.

GE HFS' counterclaim concerning the $400,000 carve out and attorneys' fees also relate to the enforcement of the debt obligation because GE HFS believed, albeit mistakenly, that the Counterclaim Defendants owed it $400,000 under the Loan Agreement, the Revised Personal Guaranty, and the Settlement Agreement. Moreover, GE HFS' claim for attorneys' fees relates to the enforcement of the debt obligation because GE HFS showed that obligation to pay attorneys' fees arose in the contract of indebtedness that it was seeking to enforce, namely the Loan Agreement and the Revised Personal Guaranty.

Because the preponderance of the evidence shows that the District Court Litigation related to the enforcement of the Loan Agreement and Revised Personal Guaranty after the Counterclaim Defendants defaulted on their debt obligations, this court finds that GE HFS has satisfied its burden with regard to this element. Given the law and the facts relevant to this case, no rational juror could find otherwise.

### iv. Debt Obligation Exceeds $100,000

To be enforceable, the total amount of a contract for indebtedness must exceed $100,000. OHIO REV. CODE ANN. § 1301.21(C). On October 9, 2003, the Plaintiff Companies executed Amendment Number 8 to the Loan Agreement and became borrowers pursuant to the Revolving

Credit Note.  On that same date, Dr. Saad also ratified and confirmed the Personal Guaranty.  By doing so, the Counterclaim Defendants assumed a debt obligation that exceeded $100,000.   This fact is uncontested by the parties.  In fact, by November 21, 2003, the total indebtedness owed to GE HFS was at least $3,314,951.25.

**v. Attorneys' Fees are Reasonable**

Section 1301.21 also requires that the fees assessed be reasonable.  OHIO REV. CODE ANN. § 1301.21(D).  The Counterclaim Defendants contest the reasonableness of the $1,085,458.13 in legal fees and costs amassed by GE HFS during the District Court Litigation.  The Counterclaim Defendants argue that GE HFS' counsel wrote billing descriptions that are unintelligible due to redacting, allocated time to tasks in an unascertainable manner due to block billing, spent too much time preparing bills, kept inaccurate records, and performed duplicative work because three firms were hired to represent GE HFS.  The Counterclaim Defendants also claim that it was unreasonable for GE HFS to employ firms located outside the state.

In determining what constitutes a "reasonable amount" of fees under § 1301.21, paragraph (D) places the burden upon the Counterclaim Defendants to show that GE HFS' fees are improper, providing as follows:

> In determining the amount of attorney'' fees that is reasonable, all relevant factors shall be considered, including but not limited to, the nature of the services rendered, the time expended in rendering the services, the amount of money and the value of the property affected, and the professional skill and expertise of the attorney or attorneys rendering the services.  Unless a court has been requested to make a determination of the amount of attorneys' fees that is reasonable and finds to the contrary by a preponderance of the evidence, the following are deemed reasonable amounts:
>
> . . .
>
> (2) If the commitment to pay attorney'' fees is not based upon a specific percentage of the total principal, interest, and other charges owed on the contract of indebtedness, an amount

equal to the attorneys' fees customarily charged by the attorney or attorneys rendering the services.

OHIO REV. CODE ANN. § 1301.21(D). Section 1301.21 requires that the Counterclaim Defendants show, by a preponderance of the evidence, that GE HFS' fees are in excess of those "customarily charged." If the Counterclaim Defendants cannot prove this, GE HFS' attorneys' fees are deemed to be reasonable. "Merely pointing the Court to an anomalous fee is not sufficient. Section 1301.21(D)(2) takes a subjective view, requiring that a debtor show why the particular fee is not 'customarily charged by the attorney or attorneys rendering the services.'" *In re McKenna*, 362 B.R. 852, 857 (Bankr. N.D. Ohio, 2006). Here, the Counterclaim Defendants have made no showing that GE HFS' counsel's redaction, time allocation, block billing, or record keeping were not customary. Moreover, the Counterclaim Defendants have failed to show that hiring local and out-of-town counsel is not customary. In sum, the Counterclaim Defendants have proffered no evidence to show that GE HFS' fees and costs were not customary. They have, therefore, failed to satisfy their statutory burden of demonstrating that the fees and costs were unreasonable.

After reviewing the relevant declarations GE HFS' counsel's time records, the court finds that all of the time actually spent on this matter by Collins & Scanlon LLP, Pitney Hardin, and Quarles & Brady LLP was time reasonably expended, especially in light of the complicated and protracted nature of the case. The court further finds that the hourly rates actually charged by GE HFS' counsel are reasonable rates for the relevant community for the work performed.

**V. Conclusion**

The court finds that the Loan Agreement and Revised Personal Guaranty in this case constitute a contract of indebtedness that includes a commitment to pay attorneys' fees. Moreover, the court finds that the contract is being enforced through judicial proceedings after its maturity.

20

Furthermore, the contracts satisfy the requirements of § 1301.21(C), as the amount due under the Loan Agreement at the time Amendment Eight and the Revised Personal Guaranty was executed and was well over the required $100,000.  The attorneys' fees and costs provisions also satisfy the requirements of § 1301.21(D) in that they are reasonable.  Thus, the attorneys' fees provision in the Loan Agreement and the Revised Personal Guaranty are enforceable pursuant to Ohio Revised Code § 1301.21.

The court, therefore, grants GE HFS' motion for summary judgment on the issue of attorneys' fees and costs (Doc. No. 67) and awards GE HFS $1,055,312.23 in attorneys' fees pursuant to O.R.C. § 1301.21 as well as $30,145.90 in costs, for a total award of $1,085,458.13. Defendants are directed to pay the awarded fees and costs to plaintiffs no later than December 31, 2008.

This Order is final and appealable.

IT IS SO ORDERED.

                                           /s/ Ann Aldrich
                                           ANN ALDRICH
                                           UNITED STATES DISTRICT JUDGE


**Dated:  September 26, 2008**